## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mary K. Hanson,                                Civil No. 16-2932 (DWF/LIB)

　　　　　　　　Plaintiff,

　　　　　　　　　　　　　　　　　　　　**MEMORANDUM**
v.                                            **OPINION AND ORDER**

Northern Pines Mental Health
Center, Inc.,

　　　　　　　　Defendant.

---

Daniel E. Warner, Esq., Warner Law Office, counsel for Plaintiff.

Dean A. LeDoux, Esq., and Neil S. Goldsmith, Esq., Gray Plant Mooty, counsel for
Defendant.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment by Defendant

Northern Pines Mental Health Center, Inc. ("Defendant" or "Northern Pines").  (Doc.

No. 17.)  For the reasons stated below, the Court grants in part and denies in part the

motion.

## BACKGROUND

Mary K. Hanson ("Plaintiff" or "Hanson") was employed at Northern Pines as a

Certified Peer Recovery Specialist ("Peer Specialist") from May 2012 to September

2014.  (Doc. No. 21 ("Goldsmith Aff.") ¶ 2, Ex. B ("Hanson Dep.") at 39, 72-73, 246.)

As a Peer Specialist, Hanson helped clients with mental health issues to identify and meet

goals during individualized weekly or bi-weekly sessions. (*Id.* at 95-97.) In this role, Hanson drove clients around the community to support recovery goals. (*Id.* at 62-64, 107-11.) Northern Pines also required Hanson, and all Peer Specialists, to document progress notes and other information for these sessions in an electronic health record called Procentive. (Goldsmith Aff. ¶ 2, Ex. D ("Leikvoll Dep.") at 15-16.) Northern Pines submitted this documentation to the Minnesota Department of Human Services ("DHS") for reimbursement for Peer Specialist services. (Hanson Dep. at 98-101.)

Peer Specialists are required to have a history of mental illness because personal experience with mental health recovery allows Peer Specialists to relate to clients. (Hanson Dep. at 52, 56-57; *see* Leikvoll Dep. at 11.) During Hanson's February 2012 interview for the Peer Specialist position, she discussed her own mental health recovery with Holly Biggins. (Hanson Dep. at 50-53.) Hanson also told Biggins she had a reading disability that made it difficult for her to read for extended periods of time and that could cause motion sickness while reading small print for too long. (*Id.* at 55, 60-61.) Biggins told Hanson this would not be an issue and that this disability would help her to relate to clients with similar experiences. (*Id.* at 55-57.) Biggins informed Hanson that she needed a working car and auto insurance for the job because Peer Specialists are required to drive in their position. (*Id.* at 62.) Biggins discussed electronic documentation in the interview and noted that Hanson would receive support to complete it. (*Id.* at 58-59.)

Northern Pines hired Hanson. (*Id.* at 64-65.) In April 2012, Hanson attended an intensive training program to attain her Peer Specialist certification. (*See id.* at 65-66.) The program involved a lot of reading, which Hanson successfully completed by taking

2

frequent breaks.  (*Id.* at 69.)  Hanson passed her certification training with "some of the highest scores [the instructor] had ever seen" and a perfect score on the final exam.  (*Id.* at 67-68.)  Hanson began working at Northern Pines on May 1, 2012.  (*Id.* at 72-73.)  She then completed orientation and received some computer training, although she encountered several issues with the computer provided by Northern Pines.  (*See id.* at 73-79.)  She later used a computer she had obtained from Minnesota State Services for the Blind ("MSSB") because the computer issued by Northern Pines "never worked." (*Id.* at 79, 83, 137.)

At the relevant times during Hanson's employment at Northern Pines, Peer Specialists worked primarily with Vickie Buck, Teri Gerhardt, and Lynn Jensen.  Buck supported Peer Specialists by reviewing documentation in Procentive to ensure it was properly entered for billing purposes.  (Doc. No. 30 ("Buck Aff.") ¶ 2.)  Gerhardt supervised the Peer Specialists in her role as Treatment Director.  (Doc. No. 27 ("Gerhardt Aff.") ¶ 2.)  Jensen served as Director of Adult Rehabilitative Mental Health Services and was also responsible for the supervision of the Peer Specialists.  (Goldsmith Aff. ¶ 2, Ex. C ("Jensen Dep.") at 9-10, 12-15.)  Gerhardt and Jensen reported to Julie Leikvoll, Director of Operations at Northern Pines.  (Leikvoll Dep. at 7-9.)

During Hanson's employment as a Peer Specialist, Northern Pines gave Hanson some accommodations for her vision difficulties and reading disability.  (Hanson Dep. at 134-36.)  These accommodations included a software program that magnified text, printed copies of materials in large font, and a large computer monitor.  (*Id.* at 135, 137, 174-75; Goldsmith Aff. ¶ 2, Ex. G ("Larson Dep.") at 40.)  Hanson also requested a job

3

coach to assist her with documentation issues, but Northern Pines did not grant her request. (Hanson Dep. at 150-59; *see also* Doc. No. 39 ("Warner Aff.") ¶ 11, Ex. I.)

Hanson performed her role as a Peer Specialist "very well." (Goldsmith Aff. ¶ 2, Ex. E ("Gerhardt Dep.") at 40.) Gerhardt described Hanson as "very good with her peers," further noting that "[p]eers loved her." (*Id.*) Gerhardt also recognized, however, that Hanson "was a lot of work" and failed to "understand and grasp documentation." (*Id.*; *accord* Hanson Dep. at 186-89; Goldsmith Aff. ¶ 2, Ex. H ("Buck Dep."), Ex. 56.) Hanson made several types of errors, such as missing entries, wrong billing codes, overlapping meeting and travel times, and failing to complete progress notes. (Hanson Dep. at 188-89.) For example, on May 15, 2014, Buck identified nineteen errors Hanson made between January and May 2014. (Buck Aff. ¶ 5, Ex. C.) In addition, as of March 18, 2014, Hanson had failed to make any travel entries for the month. (Buck Aff. ¶ 3, Ex. A.) In July 2014, Hanson entered travel times incorrectly in every progress note. (Doc. No. 27 ("Gerhardt Aff.") ¶ 12, Ex. H.)

Procentive documentation errors were not unusual among the Peer Specialists. (*See* Buck Dep. at 20.) Buck was responsible for reviewing Peer Specialist documentation "to ensure that all of the documentation for all of the work that we provide for our clients is in our software so that it gets billed correctly." (*Id.* at 7.) Buck encountered common errors made by Peer Specialists, including inaccurate or missing appointment times, travel times, mileage, appointment statuses, and progress notes. (*Id.* at 22-23.) Buck frequently communicated with Peer Specialists to ask them to fix documentation issues. (*See id.* at 20; *see also* Warner Aff. ¶ 5, Ex. C.) In addition,

Northern Pines staff worked with the Peer Specialists during staff meetings to troubleshoot documentation issues and provide necessary follow-up training. (Buck Dep. at 27-28, 44-45; Hanson Dep. at 192-95.)

Buck identified numerous documentation errors by multiple Peer Specialists, including, for example, Charly Niesen, Vicki Liebeg, Randy Karppinen, Richard Powell, and Barbara Rekowski. (*See* Warner Aff. ¶ 5, Ex. C; Buck Dep. at 32-35, 54, 63.) In May 2014, Buck compiled a list of thirty-nine documentation errors for Niesen to fix from the previous ten months. (Warner Aff. ¶ 5, Ex. C, Ex. 7 at NP0001692-93.) On August 18, 2014, Buck identified twelve errors made by Niesen over the previous two weeks. (*Id.* at NP0001660-61.) When assessing Vicki Liebeg's entries for January and February of 2014, Buck identified fifty-five documentation errors. (Warner Aff. ¶ 5, Ex. C, Ex. 25 at NP0001858-59.) Karppinen made six errors over the course of eight days in May, with one additional unresolved error from April 2014. (Warner Aff. ¶ 5, Ex. C, Ex. 19 at NP0001784-85.) He continued to make a similar number of errors for the next few weeks, including five errors within nine days in July 2014. (*Id.* at NP0001761-62.) Powell had seventeen unresolved errors between January 2014 and April 2014. (Warner Aff. ¶ 5, Ex. C, Ex. 21 at NP0001798-99.) However, on August 5, 2014, Buck only identified two errors made by Powell in the previous week. (*Id.* at NP0001793.) Between May 22, 2014 and continuing through August 25, 2014, Buck e-mailed Rekowski seven times regarding eight documentation errors. (Warner Aff. ¶ 5, Ex. C, Ex. 8 at NP0001640-47.)

Jensen testified that Procentive documentation issues could usually be addressed through additional training. (Jensen Dep. at 21.) She further testified that when managing documentation issues with Peer Specialists, "[n]othing rose to [the] level" that required disciplinary action, warnings, suspensions, or discharge. (*Id.*) Leikvoll similarly testified that she did not recall any of the individuals she identified as having difficulties with Procentive being terminated for that reason, except for possibly Liebeg. (Leikvoll Dep. at 17-19.) Even with respect to Liebeg, however, Leikvoll could "not recall the specifics" regarding the reasons for her termination and later indicated her primary issue was possibly "absenteeism." (*Id.* at 19, 24-25.) In determining what errors were considered serious, Leikvoll agreed "that it's not the fact that they made the errors that's significant; it's whether or not they're correcting those errors." (*Id.* at 67-68.)

On August 5, 2014, Hanson met with Buck to discuss documentation. (Warner Aff. ¶ 10, Ex. H.) After that meeting, Buck e-mailed Jensen, Gerhardt, and Leikvoll. (*Id.*; Buck Dep. at 52-53.) Buck wrote that Hanson "reported that something started happening with her eyes last week . . . she went to get an eye exam yesterday to find that something is pulling loose from the back of her eye." (Warner Aff. ¶ 10, Ex. H.) Buck explained that Hanson would be getting new glasses, and that "she will work on the Procentive fixes when her vision is better." (*Id.*) Jensen responded, "Should she be driving?" (*Id.*) The same day, Leikvoll forwarded these e-mails to Glenn Anderson, an attorney and Executive Director of Northern Pines. (*Id.*; Goldsmith Aff. ¶ 2, Ex. A ("Anderson Dep.") at 5, 9-10.) Leikvoll asked: "[C]an we direct Mary Kay not to transport consumers. She is very litigious." (Warner Aff. ¶ 10, Ex. H.) On

6

August 19, 2014, Anderson responded, "We can on our dime and work time, but what she does on her own is none of our business and we shouldn't be 'directing' anything outside of work." (*Id.*)

Earlier that year, in May 2014, Jensen and Gerhardt had made comments to each other via e-mail about Hanson, including comments relating to her vision. For example, on May 11, 2014, Hanson informed Jensen that she had difficulty using Procentive "in the evening hours" and that during the day she was taking a medication so she could "see print for short times without becoming physically ill." (Warner Aff. ¶ 16, Ex. N.) Jensen forwarded the e-mail to Gerhardt, noting "This maybe [sic] an issue down the road." (*Id.*) Gerhardt responded, "Oh my! Yep!" (*Id.*) On May 20, 2014, Hanson e-mailed Jensen requesting that a client be assigned to another Peer Specialist because the client had stated he had a crush on Hanson and would attempt "to sit very close" by Hanson. (Warner Aff. ¶ 17, Ex. O.) Jensen forwarded the e-mail to Gerhardt, who responded, "What a hottie! RRRAAARRRR!!" to which Jensen replied, "Lol." (*Id.*) On May 26, 2014, Hanson e-mailed Gerhardt requesting an accommodation with e-mails because her vision condition made it difficult to read a lot of e-mails and document in Procentive. (Warner Aff. ¶ 15, Ex. M.) She mentioned that she gets motion sickness and offered to request help from MSSB. (*Id.*) She also noted, "I understand that I need to fix things and will work hard to get everything caught up." (*Id.*) Gerhardt forwarded the e-mail to Jensen, writing "Heres [sic] your chuckle for the day!!! Oh. . . . It gets even better!" (*Id.*)

Leikvoll learned of Hanson's documentation issues in late July or August 2014. (Leikvoll Dep. at 92-94, Exs. 30, 31, 33.) In an August 9, 2014, e-mail to Anderson and

Biggins, Leikvoll reported that Hanson's impressive work with clients was "being rapidly overshadowed by failure to correct her errors and dishonesty."  She wrote, "I anticipate a written corrective action plan of action will need to be my next step."  (Leikvoll Dep., Ex. 31.)  On August 11, 2014, Buck e-mailed Leikvoll a "paper trail" of Hanson's documentation issues.  (Buck Aff. ¶ 7, Ex. E.)

On August 20, 2014, Leikvoll met with Hanson to discuss her documentation issues and the plan.  (Leikvoll Dep. at 108-12.)  The plan required that Hanson cancel her appointments for two days "to focus on documentation."  (Hanson Dep., Ex. 5.)  The plan authorized Hanson to continue to meet with peers in the community or their homes "after documentation is completed, which will likely be by tomorrow afternoon."  (*Id.*)  Hanson testified that Leikvoll had warned her in the meeting that she may be disciplined if she did not improve her documentation, but she was not told she could face termination. (Hanson Dep. at 203-04.)

During the August 20, 2014, meeting, Hanson explained that she was experiencing vision issues.  (*Id.* at 204.)  In the action plan, Leikvoll prohibited Hanson from driving clients indefinitely, noting that she made the decision "because of the numerous comments Mary Kay has made about vision impairments, eye health and performance issues related to eyesight."  (Hanson Dep., Ex. 5.)  The plan stated that Hanson "offered to provide a doctor's note regarding her ability to drive."  (*Id.*)  The same day, Hanson's eye doctor sent a note to Northern Pines stating: "Mary Hanson has 20/20 acuity with correction in each eye.  Her vision is good for driving."  (Warner Aff. ¶ 9, Ex. G.)

8

After this meeting, Buck wrote to Jensen regarding Hanson, stating, "I can't imagine she got much done at all" during the time she was supposed to be making Procentive corrections. (Buck Aff. ¶ 8, Ex. F.) Buck wrote that Hanson had made some personal phone calls, including one to her doctor, and that "[s]he was in/out so much, there wasn't much time to work on anything for a significant amount of time." (*Id.*) Hanson describes the day much differently. (*See* Hanson Dep. at 212-14.) Hanson recalls "sitting in a room, working very, very hard for a long period of time," taking at least one break, and calling her eye doctor. (*Id.* at 212-13.) She also testified that she came into the office early the next day to work on documentation, but encountered an electrical issue with her computer charger, which started smoking. (*Id.* at 214-15.) During this incident, Hanson remembers hearing Gerhardt on the phone with Jensen. (*Id.* at 215.) Hanson recalls Jensen "yelling," asking whether Hanson was "causing a scene," and wondering if they could call the police to come get Hanson. (*Id.* at 215-18.)

Despite these challenges, on August 21, 2014, Hanson completed the documentation with Gerhardt's assistance. (Gerhardt Aff. ¶ 14, Ex. J; *see also* Hanson Dep. at 218-21.) Gerhardt noted that Hanson informed her that "she cannot see the computer and is unable to complete 'proper minutes.'" (Gerhardt Aff. ¶ 14, Ex. J.) Gerhardt also wrote that Hanson "is able to complete notes and make them audit ready—with assistance and prompting." (*Id.*) In her deposition testimony, Hanson indicated that her inability to properly document entries in Procentive was due to lack of adequate training rather than her vision issues. (Hanson Dep. at 172-73, 179.) She also explained,

however, that her inability to see the screen well made entering information into Procentive difficult.  (*Id.* at 162-66.)

On August 25, 2014, Leikvoll received a call from the MSSB.  (Leikvoll Dep. at 140.)  The caller informed her it would be illegal to prevent Hanson from driving, that she had passed her eye exam, and that Hanson needed accommodations for her vision condition.  (*Id.* at 140-41.)  The next day, Gerhardt learned that another Peer Specialist had received a call from an attorney the previous day asking about workplace accommodations.  (Warner Aff. ¶ 13, Ex. K.)  Gerhardt informed Leikvoll, who forwarded Gerhardt's e-mail to Anderson, writing, "[s]ounds like Mary Kay got an attorney who is fishing for information about work place [sic] accommodations."  (*Id.*)

Hanson submitted a note dated August 27, 2014 to Leikvoll requesting "a job coach from [MSSB] if, in the future, there is [sic] an overwhelming amount of changes to be made in Procentive or any other program that would require a lot of reading or calculations with numbers."  (Warner Aff. ¶ 11, Ex. I; Leikvoll Dep. at 126; Hanson Dep. at 231-32.)  She also requested to be allowed to drive again, noting that she had provided a doctor's note on the issue.  (Warner Aff. ¶ 11, Ex. I.)  In her August 27, 2014 note, Hanson stated:  "If you have questions regarding my ability to drive you can talk to Casey Streich, regarding ADA responsibilities at 612-377-1788 or Pam Gowan from the Department of Employment and Economic Development State Services for the Blind at 651-639-2339."  (*Id.*)  Leikvoll did not permit Hanson to drive clients after receiving her request and did not request a fitness for duty examination by any other physician. (Leikvoll Dep. at 96-100, 126-27.)

10

On approximately August 29, 2014, Leikvoll requested "a timeline [sic] of Hanson's performance issues" because she "was contemplating terminating Hanson's employment with Northern Pines." (Doc. No. 20 ("Leikvoll Aff.") ¶ 7.) Gerhardt shared this time line with Leikvoll, which contained ten entries describing issues from May 16, 2014, through August 27, 2014. (Gerhardt Aff. ¶ 14, Ex. J.) According to Gerhardt's time line, Hanson "stated her 'eye issues' are interfering with paperwork" as early as June 17, 2014 and indicated that "she [was] unable to see" due to her eyes being dilated on August 5, 2014. (*Id.*) Only two of the entries described issues that occurred after Hanson completed her documentation fixes on August 21, 2014, and these entries did not describe any documentation issues. (*Id.*) The August 25, 2014 entry described how Hanson had mentioned "a new diagnosis of ADHD and Executive Functioning Disorder" and "stated in front of peers [that she was] hiring . . . an attorney and advocate." (*Id.*)

In a September 4, 2014 e-mail to Gerhardt, Jensen, and Leikvoll at 12:15 p.m., Buck reported that Hanson had requested assistance updating an appointment's status, creating a time module entry, and entering mileage in Procentive. (Buck Dep., Ex. 56.) Buck found this "a bit disturbing because I have showed her MANY times, e-mailed and printed the step-by-step instructions many times, etc." (*Id.*) Buck described Hanson as "very agitated" because Hanson was "angry" that she was not allowed to drive clients. (*Id.*) She explained that Hanson informed her that a client had cancelled a meeting based on the driving restriction. (*Id.*) According to Buck, "[Hanson] said that all of her clients are upset about NP not letting her drive them and more will be cancelling." (*Id.*)

11

Earlier on September 4, 2014, at 9:26 a.m., Gerhardt had e-mailed Hanson, writing that she had heard that Hanson was reportedly "suing Northern Pines." (Warner Aff. ¶ 4, Ex. B.) Gerhardt asked Hanson to stop discussing "personal issues" at work. (*Id.*) Leikvoll and Jensen were copied on this e-mail. (*Id.*) At 10:02 a.m., Hanson responded to Gerhardt, confirming that she had informed another individual that she "had filed a complaint with the Americans with Disability, as I told you I would." (Warner Aff. ¶ 12, Ex. J.) At 10:05 a.m., Gerhardt forwarded this e-mail to Leikvoll and Jensen. (*Id.*) Also at 10:05 a.m., Leikvoll forwarded Gerhardt's original e-mail referencing Hanson's "suing Northern Pines" comment to Anderson. (Warner Aff. ¶ 4, Ex. B.) A few hours later, at 2:41 p.m., Leikvoll and Anderson had a phone call. (Leikvoll Dep. at 135-36.)

On September 8, 2014, Hanson's employment was terminated.[1] (Hanson Dep. at 246.) Hanson was informed that she was "terminated due to performance issues, specifically, documentation." (Hanson Dep., Ex. 14.) According to Hanson, Leikvoll also stated in the termination meeting that Hanson "couldn't see" and "couldn't drive because [she] couldn't see." (Hanson Dep. at 248-49.) Hanson questioned the justification for her termination because "everything was perfect" in her documentation since the corrective action plan was completed. (*Id.* at 249-50.)

Anderson testified that his role in Hanson's termination "was to affirm or not affirm" Leikvoll's termination decision. (Anderson Dep. at 27.) He explained that he

---

[1]    Although she was not notified of her termination until a meeting on September 8, 2014, Hanson testified that she realized she was being fired as of Friday, September 5, 2014 because she "was locked out of the system" on her computer. (Doc. No. 21 ("Goldsmith Aff.") ¶ 2, Ex. B ("Hanson Dep.") at 246.)

had likely affirmed Leikvoll's decision in a cell phone conversation. (*Id.* at 27-29.)
Leikvoll's cell phone records indicate that the only call she had with Anderson between
September 4, 2014, and September 8, 2014, was the call at 2:41 p.m. on September 4,
2014. (Warner Aff. ¶ 14, Ex. L at NP0002049-50; *see also* Leikvoll Dep. at 135-37.)
The Human Resources Director at Northern Pines was not consulted about the
termination decision, the corrective action plan, or Hanson's accommodation requests.
(Warner Aff. ¶ 20, Ex. R ("Brausen Dep.") at 6-9, 34-37, 47-49.)

Hanson commenced this action on August 31, 2016. (Doc. No. 1.) Plaintiff
asserts four causes of action: (1) disability discrimination under the Americans with
Disabilities Act ("ADA"); (2) disability discrimination under the Minnesota Human
Rights Act ("MHRA"); (3) retaliation under the ADA; and (4) unlawful reprisal under the
MHRA. (*See id.* ¶¶ 19-34.) On August 15, 2017, Northern Pines moved for summary
judgment on all claims.[2] (Doc. No 17.)

---

[2]     When briefing this motion, Defendant argued as though Plaintiff had asserted a
discrimination claim based on actual disability rather than a "regarded as" claim. (Doc.
No. 19.) In response, Plaintiff did not respond to these arguments and clarified that she
asserted only a "regarded as" claim. (Doc. No. 38.) In its reply brief, Defendant asserted
arguments for dismissal under a "regarded as" theory, but argued under the old "regarded
as" standard which was superseded by the ADA Amendments Act of 2008. (*See* Doc.
No. 55.) Following oral argument, the Court permitted the parties to file supplemental
briefing addressing Plaintiff's claims under a "regarded as" theory. (*See* Doc. Nos. 63,
66, 67.)

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### II.    Plaintiff's Disability Discrimination Claims

Hanson argues that Northern Pines discriminated against her by terminating her employment because it regarded her as disabled.  Northern Pines argues that it did not

14

regard Hanson as disabled and that it did not terminate her employment because of its

perception of her disability.  Rather, Northern Pines argues that it terminated Hanson

because she could not perform the essential function of documentation.

The ADA and MHRA prohibit employers from discriminating against employees

based on disability.  42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2.  Courts

consider claims of disability discrimination under these provisions simultaneously.  *See*

*McCracken v. Carleton College*, 969 F. Supp. 2d 1118, 1129-30 (D. Minn. 2013).  To

establish discrimination, a plaintiff may present either direct or indirect evidence.  *See*

*St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012).  If the plaintiff relies

on indirect evidence, she can "avoid summary judgment by creating the requisite

inference of unlawful discrimination through the *McDonnell Douglas*[3] analysis, including

sufficient evidence of pretext."  *Id.*  (citation omitted).  Under this framework, the

plaintiff must first establish a prima facie case by showing that she "(1) is disabled within

the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has

suffered an adverse employment action because of her disability."  *Hill v. Walker*, 737

F.3d 1209, 1216 (8th Cir. 2013); *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010).  The

plaintiff's burden at the prima facie stage "is quite low."  *Orr v. City of Rogers*, 232 F.

Supp. 3d 1052, 1066 (W.D. Ark. 2017) (citing *Young v. Warner-Jenkinson Co.*, 152 F.3d

1018, 1022 (8th Cir. 1998)).  If she establishes a prima facie case, "[t]he burden then

shifts to the employer to articulate some legitimate, nondiscriminatory reason for the

---

[3]     *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

15

employer's actions." *Lors*, 595 F.3d at 834 (citation omitted). "If the employer articulates such a reason, the burden returns to the employee to show the employer's justification is a pretext" for discrimination. *Id.*

### A.    Prima Facie Case

Northern Pines challenges each element of Hanson's prima facie case of discrimination. First, Northern Pines argues that Hanson has failed to show it regarded her as disabled. Second, Northern Pines claims that Hanson was not able to complete documentation and was therefore unqualified to perform the essential functions of the job with or without accommodation. Third, Northern Pines argues that Hanson has failed to show a causal connection between being regarded as disabled and her termination. To support her prima facie case, Hanson asserts that her supervisors were aware of her vision disability and, by preventing her from driving clients, removed a major job duty because of its perception of her disability.

### 1.    Regarded as Disabled

Defendant argues that Hanson has failed to point to sufficient record evidence to establish that Northern Pines regarded her as disabled. Defendant asserts that neither awareness of medical issues nor providing accommodations suffices to establish that an employer regarded an employee as disabled. Finally, Defendant contends that this case does not present a "regarded as" claim because Defendant did not stereotype Hanson based on myths about individuals with disabilities. Hanson argues that the record supports a finding that Northern Pines regarded her as disabled because it prohibited her

16

from driving. Hanson emphasizes that Northern Pines persisted in its belief that she could not drive even after her doctor had medically cleared her to do so.

A plaintiff may satisfy the first element of her prima facie case by demonstrating that she was "regarded as having [a mental or physical] impairment." 42 U.S.C. § 12102(1)(C).[4] Congress amended the ADA in 2008 to clarify that a plaintiff meets "regarded as" requirement "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."[5] *Id.* § 12102(3)(A); *see* ADA Amendments Act of 2008 ("ADAAA"), Pub.

---

[4]    The ADA provides three definitions of disability for claiming coverage to assert a claim of discrimination: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The applicable definition under the MHRA defines an individual with a disability as "any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363A.03, subd. 12.

[5]    The Court notes the apparent confusion both in the federal courts and in the parties' briefing with respect to the appropriate standard for evaluating "regarded as" claims. Prior to the ADAAA, the U.S. Supreme Court and lower federal courts required that "regarded as" plaintiffs prove that their employers perceived them to be substantially limited in one or more major life activities. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1089 (8th Cir. 2001). Congress passed the ADAAA in part to overrule such holdings. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).

However, Circuit Courts of Appeal have relied on the prior standard well after the passage of the ADAAA. *See Ariza v. Loomis Armored US, L.L.C.*, 676 F. App'x 224, 227 (5th Cir. 2017); *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 893 (6th Cir. 2016). In a recent decision out of the Western District of Michigan, a judge explicitly questioned the Sixth Circuit's *Ferrari* decision. *Equal Emp't Opportunity Comm'n v. M.G.H. Family Health Ctr.*, 230 F. Supp. 3d 796, 807 (W.D. Mich. 2017) ("The Court is uncertain why

(Footnote Continued on Next Page)

L. No. 110-325, 122 Stat. 3553 (2008). A "physical impairment" refers to "a physiological disorder or condition that affects a major body system." *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1111 (8th Cir. 2016) (citing 29 C.F.R. Pt. 1630, App'x § 1630.2(h)). The "regarded as" basis for establishing disability is inapplicable "to impairments that are transitory and minor." 42 U.S.C. § 12102(3)(B).

Hanson had told her superiors that her vision condition made it difficult for her to document in Procentive on multiple occasions. Additionally, on August 20, 2014, Leikvoll restricted Hanson's ability to drive clients because of Hanson's vision, even though a doctor certified her to drive. As evidenced in her e-mail to Anderson, Leikvoll had contemplated restricting Hanson's driving on August 5, 2014, after learning that Hanson reported vision issues. The Court concludes that Hanson has pointed to evidence to create an issue of fact on whether Northern Pines regarded her as disabled.

The ADA's regulatory guidance indicates that the "regarded as" standard is not intended to be demanding, noting as an example that "if an employer terminates an employee because he has cancer, the employer has regarded the employee as an individual with a disability." 29 C.F.R. Pt. 1630, App'x § 1630.2(l). However, this guidance also clarifies that causation is an essential component of establishing

(Footnote Continued From Previous Page)
*Ferrari* cited pre-Amendments Act cases for a principle of law that no longer applies. . . . [A]s to this case, the amended statutory language must control."). While this caselaw may explain Defendant's attempt to apply a superseded standard in this case, the Court declines to depart from the statute's clear language. *See id.*; *cf. Brown v. City of Jacksonville*, 711 F.3d 883, 889 n.7 (8th Cir. 2013) (acknowledging at least one case in which the Eighth Circuit quoted the wrong version and noting that "the district court's reliance on pre-amendment ADA standards, though incorrect, is understandable").

entitlement to invoke the "regarded as" prong. *See id.* ("[A] person must show, for both coverage under the 'regarded as' prong and for ultimate liability, that he or she was subjected to a prohibited action because of an actual or perceived impairment."); *see also* 42 U.S.C. § 12102(3)(A) (requiring a plaintiff to "establish[] that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment"). The Court considers the issue of causation, below, along with the third element of Hanson's prima facie case.

### 2.    Qualified Individual

Defendant argues that Hanson fails the second element of her prima facie case because she could not perform the essential functions of her position with or without accommodation. Specifically, Defendant argues that Hanson was unable to complete adequate documentation in Procentive and that no reasonable accommodation to her alleged disability would have permitted her to do so. Hanson argues that she met the qualifications for her position when she was terminated because she "was performing the essential functions of the job, was praised for her work with clients, was performing her Procentive function on a par with her coworkers, was current with her Procentive reports . . . and was able to drive clients." (Doc. No. 38 at 24.)

The ADA defines a qualified individual as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Employers are not required to provide accommodations when the employee is merely regarded as disabled. *See id.* § 12201(h); *accord Duello v. Buchanan Cty. Bd. of Supervisors*, 628 F.3d 968,

972 (8th Cir. 2010) ("'[R]egarded as' plaintiffs are not entitled to reasonable accommodations."). Thus, in a "regarded as" case, the inquiry under this step does not consider the effect of any possible accommodations. *See Equal Emp't Opportunity Comm'n v. M.G.H. Family Health Ctr.*, 230 F. Supp. 3d 796, 811 (W.D. Mich. 2017). When determining which job functions are essential, "consideration shall be given to the employer's judgment." 42 U.S.C. § 12111(8).

Here, Northern Pines considered documentation an essential job function. There is no formal job description in the record, but there is evidence that Hanson was informed that documentation was a required part of her job. Peer Specialists spent a significant amount of time documenting, and Northern Pines needed accurate documentation to satisfy DHS requirements. Northern Pines also assigned Buck to review Peer Specialist documentation, and she worked with each Peer Specialist to correct errors in documentation. These facts suggest that an ability to document was an essential function of the Peer Specialists role, but do not indicate that perfect documentation was required. Rather, the record suggests that Peer Specialists needed to document and correct errors when directed.

The Court concludes that the record contains sufficient evidence to raise a genuine issue of material fact as to whether Hanson's documentation issues disqualified her for her job. Gerhardt, Hanson's direct supervisor, noted that although she struggled with documentation, "[s]he did her job very well." (Gerhardt Dep. at 40.) Gerhardt also noted that Hanson could document when given guidance. Hanson claims that after working with Gerhardt to make corrections according to the action plan, she accurately

documented through the remainder of her time at Northern Pines. Nothing in the record suggests otherwise. If Hanson was able to document in an accurate and timely manner for the two weeks prior to her termination, she was likely qualified for the position. Additionally, Hanson was employed by Northern Pines for over two years without receiving disciplinary action for her documentation abilities, which suggests she met the basic qualifications for the job.

### 3.   Adverse Action and Causation

The parties do not dispute that Hanson's termination constitutes an adverse action.[6] However, Defendant argues that Hanson's disability discrimination claims are subject to dismissal because Hanson has failed to demonstrate a causal connection between Northern Pines' alleged perception of Hanson's disability and her termination. In particular, Defendant emphasizes that there is no evidence to support that Hanson was terminated because she was restricted from driving. Hanson's theory of causation appears to rely on the interrelated circumstances surrounding the driving restriction, her claims that such a restriction violated the ADA, and Northern Pines' subsequent termination of her employment. She explains, "Northern Pines misperceived the extent of Hanson's vision impairment and restricted her from driving clients. Hanson then complained to management that this driving restriction was unfounded, and when she got

---

[6]   Some references in the parties' briefing appear to suggest that Northern Pines' driving restriction could arguably constitute an adverse action. (*See* Doc. No. 19 at 31 n.7; Doc. No. 55 at 11; Doc. No. 66 at 7 n.3, 8.) Because Hanson did not plainly advance this argument, and in light of the parties' clear focus on Hanson's termination, the Court declines to consider whether the driving restriction constitutes an adverse action.

no results, threatened legal action under the ADA.  Northern Pines then fired her."  (Doc. No. 38 at 13; *see also* Doc. No. 66 at 8 ("By taking away this job duty . . .  based on the erroneous perception that she could not drive, and then shortly thereafter terminating Hanson's employment out of a false fear of her driving ability because of her vision impairment, Defendant violated the ADA by taking adverse employment actions because it regarded her as disabled.").)  Although not completely clear on this point, it appears that Hanson argues that because driving was an essential function of the position, removing the job duty of driving bears a causal relationship to her termination.

Under the third element of a prima facie case, a plaintiff must show that she suffered adverse action because of her disability.  *See Brown v. City of Jacksonville*, 711 F.3d 883, 889 (8th Cir. 2013) ("Congress's 2008 amendment to the ADA did not relieve [a plaintiff] of the need to present direct or indirect evidence showing a causal link between the adverse employment action and her disability.").  Thus, a plaintiff's failure to advance sufficient evidence that an employer took adverse action "on the basis of disability" warrants summary judgment in the employer's favor.  *See Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 804-05 (8th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).  The Eighth Circuit has noted that "[a] temporal connection can demonstrate a causal link between an adverse employment action and the employee's disability." *Equal Emp't Opportunity Comm'n v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014).  At the same time, however, an employer's long awareness of the claimed disability and prior accommodations may undermine any inference of causation.  *See id.* at 970.

The Court concludes that Hanson has failed to raise an issue of material fact sufficient to establish a prima facie case as to whether she was fired because of Northern Pines' perception of her disability.  Even when viewing the record in her favor, the Plaintiff has not identified evidence to show that there was any causal link between Northern Pines' perception of Plaintiff's vision condition and her termination.  As noted above, Plaintiff's failure to establish causation undermines not only the third element of her prima facie case, but also her entitlement to relief under the ADA's "regarded as" prong.  *See* 29 C.F.R. Pt. 1630, App'x § 1630.2(l).  The Court therefore determines that Defendant is entitled to summary judgment on Plaintiff's discrimination claims under the ADA and the MHRA.

### B.    Pretext

Furthermore, even if Plaintiff could establish a prima facie case, the record does not support a finding that Defendant's stated reason for her termination was a pretext for discrimination.  Defendant argues that its reasons for termination are not pretextual because Hanson could not accurately document in Procentive.  Hanson argues that no other Peer Specialist was disciplined for documentation issues and that it was not the employer's practice to terminate employees for documentation errors.  In addition, Hanson suggests that she was fulfilling her documentation responsibilities on par with her peers.  She also disputes Defendant's suggestion that she was not seeking to improve or open to guidance from her supervisors.  In short, Hanson argues that there is a genuine issue of fact regarding whether Defendant's stated reason for her termination was pretext for discrimination because it regarded her as disabled.

23

"To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse action was false and that discrimination was the real reason." *Lors*, 595 F.3d at 834 (quoting *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008)). At this stage, "[t]he plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Id.* Pretext may be established by facts demonstrating that the employer did not follow standard policies in the plaintiff's situation or that comparable employees were treated differently. *Prod. Fabricators, Inc.*, 763 F.3d at 970. In evaluating pretext, however, the Eighth Circuit has repeatedly acknowledged that "a federal court is not a super-personnel department with authority to review the wisdom or fairness of business judgments made by employers." *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1118 (8th Cir. 2018); *see also Doucette v. Morrison Cty., Minn.*, 763 F.3d 978, 984 (8th Cir. 2014) ("It is not our role to question that [the employee's] errors were a problem for her employer.").

The Court concludes that Plaintiff has failed to identify evidence to support that Hanson was terminated because Northern Pines regarded her as disabled. Although the Court finds Hanson's comparator evidence to be persuasive, the record lacks evidence by which a reasonable jury could infer "that discrimination was the real reason" for Hanson's termination. *Lors*, 595 F.3d at 834 (citation omitted). Thus, for this additional reason, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's discrimination claims.

III.    **Plaintiff's Retaliation Claims**

Hanson also asserts that Northern Pines retaliated against her by terminating her employment because she requested accommodations for her vision impairment, sought outside assistance from an attorney and the MSSB, and filed a claim against Northern Pines.  Defendant argues that summary judgment on Plaintiff's retaliation claims is warranted because she cannot establish the requisite element of causation to tie her termination to her actual protected activity.

A plaintiff may prevail on a retaliation claim even if her discrimination claim is ultimately unsuccessful.  *Cf. Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (in a Title VII case, noting that, "[i]n general, as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim").  The ADA makes it unlawful for employers to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Courts analyze retaliation claims under the *McDonnell Douglas* burden shifting framework.  *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999).

The plaintiff must establish her prima facie case by showing "(1) that [she] engaged in a statutorily protected activity, (2) that an adverse action was taken against

25

[her], and (3) a causal connection between the adverse action and the protected activity."
*Id.* If the plaintiff establishes her prima facie case, "the burden then shifts to the
defendant to proffer a legitimate nondiscriminatory reason for the adverse action." *Id.* at
1025-26. "Once the defendant establishes a legitimate nondiscriminatory reason for the
adverse action, the burden of production then shifts back to the plaintiff to show that the
defendant's reason is a pretext for discrimination." *Id.* at 1026. The same analysis
applies to Plaintiff's claim of unlawful reprisal under the MHRA. *See* Minn. Stat.
§ 363A.15; *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 859 (8th Cir. 1998); *see also*
*Lenzen v. Workers Comp. Reinsurance Ass'n*, 705 F.3d 816, 820 n.2 (8th Cir. 2013).

### A.    Prima Facie Case

#### 1.    Protected Activity

The parties appear to agree that requesting a reasonable accommodation and filing
a legal claim may constitute protected activity under the ADA. However, Defendant
argues that many other instances of conduct identified by Plaintiff do not truly amount to
protected activity. According to Defendant, this is so because Hanson did not plainly
oppose any alleged unlawful conduct and her belief that Defendant was violating the
ADA was not objectively reasonable.

Specifically, Plaintiff identifies the following as alleged instances of protected
activity: (1) disputing that her vision condition prohibited her from driving during the
August 20, 2014 meeting with Leikvoll, and providing a doctor's note regarding her
vision the same day; (2) the August 25, 2014 call from an attorney to another Peer
Specialist on behalf of Hanson seeking information about accommodations in the

26

workplace; (3) the August 25, 2014 call from a MSSB representative to Leikvoll on behalf of Hanson informing her that it was illegal to prevent Hanson from driving; (4) Hanson's August 27, 2014 note requesting accommodations and providing contact information for individuals who could further discuss "ADA responsibilities" and MSSB services, (Warner Aff. ¶ 11, Ex. I); and (5) Hanson's September 4, 2014 e-mail to Gerhardt confirming that she "had filed a complaint with the Americans with Disability, as I told you I would," (Warner Aff. ¶ 12, Ex. J).

A plaintiff's protected activity must be "based on a reasonable good faith belief that an agent of the employer was engaging in disability discrimination." *Lenzen*, 705 F.3d at 821. As the parties acknowledge, a good faith request for a reasonable accommodation constitutes protected activity to support a retaliation claim under the ADA. *See Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 907-08 (8th Cir. 2010) (following *Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003)); *see also Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001) ("[W]hen the employee specifically ties a request for work assistance to a disability, the employee engages in protected activity under the MHRA."). Filing a charge of discrimination is also plainly protected activity. *See* 42 U.S.C. § 12203(a); Minn. Stat. § 363A.15. In addition, making a report of alleged discrimination to a supervisor may also qualify as protected. *See Helton v. Southland Racing Corp.*, 600 F.3d 954, 961 (8th Cir. 2010); *see also Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011) (citing *Helton* and holding that "[plaintiff's] filing of [an] internal discrimination complaint qualifies as protected conduct").

27

The Court concludes that three of the events Hanson has identified constitute protected activity:  (1) the August 25, 2014 call from the MSSB; (2) Plaintiff's August 27, 2014 note containing a request for reasonable accommodation; and (3) Plaintiff's filing of a discrimination complaint which Defendant learned about on September 4, 2014.  Each constitutes either a request for accommodation, the filing of a discrimination charge, or a protected report of alleged discrimination.  Further, the Court finds that Hanson's good faith belief that Northern Pines' driving restriction was illegal under the ADA was not unreasonable.  This is particularly true because Hanson had the support of both an MSSB representative and an attorney who affirmed her view that she had a potentially viable claim against Northern Pines.

However, there is insufficient evidence in the record to support that Hanson engaged in protected activity during the August 20, 2014 meeting as she did not clearly challenge the driving restriction as potentially unlawful at that time.  In addition, the record does not clearly establish the nature of the August 25, 2014 call from an attorney seeking information about accommodations.  Without more detail about the content of this phone call, the Court concludes that it does not amount to protected activity.

### 2.  Adverse Action and Causation

As noted above, the parties do not dispute that Hanson's termination constitutes an adverse action.  Defendant argues, however, that Plaintiff has failed to establish a causal connection between any protected activity and her termination.  In particular, Defendant argues that Leikvoll—the decision-maker in Hanson's termination—was unaware of any threatened legal action until September 4, 2014 and that Hanson had exhibited

28

performance problems long before this time.  Defendant also argues that because Hanson began requesting disability accommodations in 2012, her subsequent accommodation requests lack temporal proximity to support causation.  Plaintiff contends that she has established causation through disparate treatment of similarly-situated employees and the close timing between her protected activity and termination.

Establishing a causal connection generally requires more than temporal proximity, "[e]specially where the employer's proffered reason for action is virtually contemporaneous with the protected activity."  *Hill*, 737 F.3d at 1219.  However, the Eighth Circuit has also recognized that "[p]roximity alone can be enough to establish causation for a *prima facie* case" in the retaliation context.  *Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015).  This is particularly true where the adverse action and protected activity are "very close" in time.  *See Orr*, 232 F. Supp. 3d at 1067 (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)).  For example, the Eighth Circuit has held that a plaintiff's protected activity and termination separated by thirteen days were "extremely close" and "sufficient, but barely so, to establish causation" in light of the "minimal showing" required to establish a prima facie case.  *See Smith*, 302 F.3d at 833. The import of timing is ultimately dependent on the facts of a particular case as "there is no definitive line drawn to show at what point a temporal connection establishes causation."  *See Prod. Fabricators, Inc.*, 763 F.3d at 973 (noting that a length of two months would be too long).

A court should determine temporal proximity based on when the employer decided to take an adverse action rather than when the decision is actually carried out.

*See Wallace*, 442 F.3d at 1119.  Whether an employer previously considered adverse employment action prior to the plaintiff's protected activity is also relevant.  *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 882 (8th Cir. 2005); *cf. Smith*, 302 F.3d at 834 ("Evidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of the temporal proximity."). Courts may also consider comparator evidence to demonstrate causation.  *Orr*, 232 F. Supp. 3d at 1067; *see also Hoover*, 632 N.W.2d at 549.

The Court concludes that Hanson has established a prima facie case of retaliation by submitting temporal and comparator evidence.  Plaintiff's protected activity on August 25, August 27, and September 4 occurred within a few days of Hanson's eventual termination on September 8, 2014.  In particular, viewing the record in the light most favorable to Plaintiff, the timing between Northern Pines' awareness of Hanson's lawsuit and Leikvoll's decision to terminate her is very close.  The record indicates that Leikvoll learned of the discrimination charge at 10:02 a.m. on September 4, 2014 and forwarded the information to Anderson a few minutes later.  The two had a phone call at 2:41 p.m. that same day and did not have any other cell phone calls up until the time Hanson was terminated on September 8, 2014.  As Anderson explained, he spoke with Leikvoll regarding the termination decision over the phone and simply affirmed her decision.  It is a reasonable inference to conclude that Leikvoll decided to terminate Hanson just prior to their September 4, 2014 cell phone call after receiving Hanson's e-mail that morning. Considering this timing along with Plaintiff's persuasive comparator evidence, addressed

in more detail below, a jury could reasonably infer that Northern Pines terminated

Hanson in retaliation for her protected activity under the ADA.

**B.**    **Legitimate Non-Retaliatory Reason**

Northern Pines claims that it terminated Hanson because of her insufficient

documentation.  Hanson does not dispute that this suffices to meet Defendant's burden at

this stage.  The Court agrees and concludes that Defendant has met its burden of

production at the second stage of the *McDonnell Douglas* analysis by articulating a

legitimate non-discriminatory reason for Hanson's termination.

**C.**    **Pretext**

The parties present similar arguments about pretext on the retaliation claims as on

the discrimination claims.  Hanson points to comparator evidence as well as the temporal

proximity between her protected activity and termination.  Plaintiff also argues that the

record demonstrates actual hostility by Northern Pines employees toward her disability

and accommodation requests, further supporting a finding of pretext.  Defendant disputes

that the individuals Plaintiff identifies are proper comparators because Hanson had more

serious errors than the other Peer Specialists and failed to make adequate efforts to

improve.  Defendant also challenges Plaintiff's suggestion that her supervisors displayed

actual animus toward her.

Given the fact-specific nature of most retaliation claims, "evidence of pretext and

retaliatory intent must be viewed in its totality."  *Wallace*, 442 F.3d at 1122.  Although

close temporal proximity may suffice to establish causation, "proximity alone is

insufficient to establish pretext."  *Gibson*, 776 F.3d at 541.  Further, if an employee

exhibited issues prior to engaging in protected activity, this may undermine a finding of pretext. *See id.* at 542. At the same time, "[w]here an employer tolerates an undesirable condition for an extended period of time, an employee takes part in protected conduct, and shortly thereafter, the employer takes an adverse action in purported reliance on the long-standing undesirable condition," a jury could reasonably conclude that the employer's justification is simply a pretext for retaliation. *Wallace*, 442 F.3d at 1122. A court may also consider a supervisor's relevant comments indicating a retaliatory motive. *See id.* at 1124.

Comparator evidence supports a finding of pretext in the retaliation context. *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006) ("An employee may prove pretext by demonstrating . . . that similarly situated employees who did not engage in the protected activity were treated more leniently."). When using comparator evidence at this stage, the plaintiff must "prove that [she] and the other employee[s] were similarly situated in all relevant respects, including that the offenses were of the same or comparable seriousness." *Orr*, 232 F. Supp. 3d at 1070 (quoting *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 998 (8th Cir. 2014)). Thus, the comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (citation omitted). This "is a rigorous test." *Prod. Fabricators, Inc.*, 763 F.3d at 970. However, the Eighth Circuit has stated that "[t]he similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Doucette,* 763 F.3d at 984 (citation omitted). "Where

32

evidence demonstrates that a comparator engaged in acts of comparable seriousness but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause." *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013) (quotation marks and citation omitted).

The Court concludes that Hanson has submitted sufficient evidence for a reasonable jury to infer that Northern Pines' reasons for terminating her employment were pretext for retaliation. Here, each of the comparators had the same supervisors, were subject to the same standards, and engaged in the same conduct by making documentation errors in Procentive. Hanson clearly struggled with documentation more than many of her colleagues. Hanson, however, focuses on Niesen, who could reasonably be viewed as having committed "offenses . . . of the same or comparable seriousness." *Orr*, 232 F. Supp. 3d at 1070. Hanson submitted evidence of Niesen's documentation errors going back to July 2013. Niesen had made significant errors over ten months without correcting them and failed to document twenty-four progress notes between January and May 2014. Similarly, Hanson failed to enter time entries for the first half of March 2014. In addition, Niesen made twelve documentation errors in mid-August 2014. In short, both Niesen and Hanson made numerous errors leading up to August 2014. Despite these similarities, Northern Pines did not discipline Niesen. Other comparators, including Liebeg, Karppinen, Powell, and Rekowski also made errors throughout 2014 without any disciplinary consequences. The record suggests that these Peer Specialists did not experience the same level of scrutiny as Hanson. Given the

substantial similarities between Hanson and these comparators, this evidence reasonably raises suspicion over Northern Pines' alleged reason for terminating Hanson.

Moreover, the very close timing between Leikvoll learning of Hanson's lawsuit and Hanson's termination also supports an inference of pretext. Northern Pines tolerated Hanson's documentation issues for many months and only chose to terminate her for these issues after she engaged in protected activity. Leikvoll also made comments and took actions that indicate her hostility toward Hanson's right to engage in protected activity. First, when reaching out to Anderson to inquire about restricting Hanson's driving privileges, Leikvoll specifically noted that Hanson was "very litigious." (Warner Aff. ¶ 10, Ex. H.) In addition, upon hearing that a Northern Pines employee had received a call regarding accommodations, she wrote to Anderson stating that it "[s]ounds like Mary Kay got an attorney who is fishing for information about work place [sic] accommodations." (Warner Aff. ¶ 13, Ex. K.) The record does not indicate that she followed up with Hanson about this phone call. Further, even after receiving a call from the MSSB regarding Hanson's driving restriction and its potential illegality, Leikvoll failed to change course.[7] Viewing the record as a whole and in the light most favorable

---

[7]    On the issue of hostility, the Court also finds the negative comments made by Jensen and Gerhardt to be relevant to the pretext inquiry. Even if it does not amount to direct evidence of discrimination, "[e]vidence of a discriminatory attitude in the workplace" supports a finding of pretext. *See Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir. 2001); *cf. Ryther v. KARE 11*, 108 F.3d 832, 843 (8th Cir. 1997) (holding that discriminatory statements of non-decisionmakers "made outside the presence of the decisionmakers . . . do not, *standing alone*, raise an inference of discrimination," but considering these comments based on evidence that a decisionmaker frequently discussed the plaintiff with one of the individuals making such remarks and

(Footnote Continued on Next Page)

to Hanson, it is reasonable to conclude that Northern Pines chose to terminate Hanson based on her decision to pursue a legal claim against it alleging unlawful discrimination.

## CONCLUSION

Northern Pines is entitled to summary judgment on Hanson's disability discrimination claims because Hanson has failed to establish a genuine issue of fact as to whether Northern Pines terminated her because it regarded her as disabled. However, a jury could reasonably conclude that Northern Pines improperly terminated Hanson in retaliation for her protected activity under the ADA and MHRA. Thus, Northern Pines' motion for summary judgment on Plaintiff's retaliation claims is denied.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. [17]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.    Defendant's motion is **GRANTED** with respect to Plaintiff's discrimination claims under the ADA and the MHRA (Counts 1 and 2), and these claims are **DISMISSED WITH PREJUDICE**.

---

(Footnote Continued From Previous Page)
typically followed his suggestions). Gerhardt and Jensen, Hanson's direct supervisors, exchanged e-mails mocking Hanson when she requested help with documentation in connection with her vision difficulties. Although neither was the ultimate decisionmaker in this case, both communicated with Leikvoll about Hanson. These e-mails relate directly to Hanson's vision challenges and Gerhardt and Jensen's perceptions of her attempts to pursue accommodations at Northern Pines. Thus, this evidence adds to the relevant factual background against which a jury could reasonably infer that Northern Pines acted in retaliation to Hanson's protected activity.

2.    Defendant's motion is **DENIED** with respect to Plaintiff's retaliation and unlawful reprisal claims under the ADA and the MHRA (Counts 3 and 4).


Dated:  March 22, 2018                      s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge